**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4314-16

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

TIMOTHY PUSKAS, a/k/a
TIMOTHY J. PUSKAS,

     Defendant-Appellant.

_____

Argued April 27, 2021 – Decided May 14, 2021

Before Judges Haas, Mawla and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 16-07-1220.

Stephen W. Kirsch argued the cause for appellant (Mazraani & Liguori, LLP, attorneys; Daniel V. Gautieri, Assistant Deputy Public Defender, and Stephen W. Kirsch, on the briefs).

Nancy A. Hulett, Assistant Prosecutor, argued the cause for respondent (Yolanda Ciccone, Middlesex County Prosecutor, attorney; Nancy A. Hulett, of counsel and on the briefs).

PER CURIAM

A Middlesex County grand jury returned a five-count indictment charging defendant Timothy J. Puskas with first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2) (count one); fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d) (count two); third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d) (count three); third-degree hindering apprehension or prosecution by concealing evidence, N.J.S.A. 2C:29-3(b)(1) (count four); and third-degree hindering apprehension or prosecution by giving false information to a law enforcement officer, N.J.S.A. 2C:29-3(b)(4) (count five).

In the opening days of the trial, the trial judge granted the State's motion to admit and play for the jury surreptitiously recorded conversations between defendant and his roommate, Wayne Stoecker, who died prior to trial. The judge also granted the State's motion to admit statements defendant made to the police on February 18, 2014.

At the conclusion of the multi-day trial, the judge granted defendant's motion for a judgment of acquittal on count four, hindering by destruction of evidence. The jury then convicted defendant of the remaining four counts.

The judge sentenced defendant to forty years in prison on the murder charge, subject to an eighty-five percent period of parole ineligibility under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.  The judge imposed shorter, concurrent terms on the remaining counts.  Therefore, defendant's aggregate sentence was forty years, subject to NERA.  Defendant appealed his convictions and sentence.

Thereafter, we remanded the matter to the judge for consideration of defendant's motion for a new trial and to recalculate jail credits.  The judge denied defendant's motion for a new trial, and reduced defendant's aggregate sentence to thirty-seven years subject to NERA.  We later remanded the matter again so that the judge could provide findings of fact and conclusions of law concerning his decision to admit defendant's February 18, 2014 statements to the police in evidence.

On appeal, defendant raises the following contentions:

POINT I

THE STATE IMPROPERLY INFORMED JURORS THAT NON[-]TESTIFYING WITNESSES HAD IMPLICATED [DEFENDANT] IN THE HOMICIDE.

A.    The Trial Court Erred in Failing to Redact the Portions of the Recorded Telephone Calls Between [Defendant] and Stoecker That Revealed That Non-Testifying Witnesses Had

Provided Information to the Police Suggesting [Defendant's] Guilt.

B.     The Court Erred in Permitting Hearsay Pertaining to the Sweatshirt that [Defendant] Allegedly Wore at the Time of the Murder.

C.     The Crawford[1] and Branch[2] Violations Require Reversal.

POINT II

[DEFENDANT'S] STATEMENT TO THE POLICE SHOULD HAVE BEEN SUPPRESSED BECAUSE HE WAS IN CUSTODY WHEN, WITHOUT INFORMING HIM OF HIS RIGHTS, DETECTIVES QUESTIONED HIM REGARDING HIS WHEREABOUTS AT THE TIME OF THE HOMICIDE.

POINT III

THE COURT ERRED IN ADMITTING CERTAIN SURVEILLANCE VIDEOTAPES INTO EVIDENCE BECAUSE THEY WERE NOT PROPERLY AUTHENTICATED AND WERE SO GRAINY THAT THE PERSONS IN THEM COULD NOT BE IDENTIFIED. IN ANY EVENT, THE COURT'S FAILURE TO PROVIDE A LIMITING INSTRUCTION REGARDING THE JURORS' USE OF THE VIDEOS REQUIRES REVERSAL.

---

[1] Crawford v. Washington, 541 U.S. 36 (2004).

[2] State v. Branch, 182 N.J. 338 (2003).

A. The State Failed to Properly Authenticate the Surveillance Videos.

B. The Videos Were Inadmissible Under N.J.R.E. 403 and State v. Driver[3] Because They Were Too Grainy to be Probative.

C. If the Videos Were to Be Played, the Judge Was Required to Provide an Instruction Listing Factors Jurors Needed to Contemplate in Considering that Evidence.

D. The Foregoing Errors Require Reversal.

POINT IV

THE PROSECUTOR COMMITTED MISCONDUCT IN SUMMATION IN MULTIPLE WAYS, INCLUDING A THEME THAT THE STATE HAD IDENTIFIED A CLOSED UNIVERSE OF SUSPECTS AND, AFTER "WHITTLING AWAY" THOSE UNLIKELY TO HAVE COMMITTED THE CRIME, [DEFENDANT] HAD TO BE GUILTY.

A. The Prosecutor Reduced her Burden of Proof by Suggesting that There was a Closed Universe of Suspects in Which [Defendant] was the Most Likely to be Guilty.

B. The Prosecutor Used an Unduly Suggestive Procedure to Urge Jurors to Identify [Defendant] as the Suspect Seen in a Surveillance Video.

C. The Prosecutor Testified, Including as an Expert in Gait Analysis, to Place McCaw and [Defendant] Together on Hartwell Street.

---

[3] State v. Driver, 38 N.J. 255 (1962).

5

[D].   The Juror's Facebook Post Reveals that the Cumulative effect of the Foregoing Errors Requires Reversal.

POINT V

THE COURT FAILED TO PROPERLY APPLY THE STATE V. CARTER[4] STANDARD IN DENYING THE MOTION FOR A NEW TRIAL.

POINT VI

THE COURT ERRED IN FAILING TO INSTRUCT JURORS REGARDING IDENTIFICATION PRINCIPLES AFTER THE PROSECUTOR, IN SUMMATION, URGED JURORS TO IDENTIFY THE SUSPECTS SEEN IN SURVEILLANCE VIDEOS AS [DEFENDANT].  (Not Raised Below). WHEN JURY QUESTIONS REVEALED THAT IDENTIFICATION WAS A CONCERN, THE JUDGE IMPROPERLY REFUSED DEFENSE COUNSEL'S REQUEST FOR A CLARIFYING CHARGE.

POINT VII

THE CUMULATIVE IMPACT OF THE ERRORS DENIED [DEFENDANT] DUE PROCESS AND A FAIR TRIAL.  (Not Raised Below).

POINT VIII

THE COURT SHOULD REMAND FOR RESENTENCING BECAUSE THE COURT HEAVILY WEIGHED THE NATURE OF CRIME AS AN AGGRAVATING FACTOR, AND FAILED TO

---

4   State v. Carter, 85 N.J. 300 (1981).

A-4314-16

WEIGH IN MITIGATION THAT THE CIRCUMSTANCES OF THE OFFENSE WERE UNLIKELY TO RECUR.

After reviewing the record in light of these contentions, we conclude that the trial court erred by permitting the State to play the recorded conversations between defendant and Stoecker to the jury which, together with the testimony of the lead investigator, violated defendant's right to be confronted with the witnesses against him under the Confrontation Clauses of the federal and State constitutions, as well as the rules prohibiting hearsay set forth in our Supreme Court's decisions in State v. Bankston, 63 N.J. 263 (1973) and Branch. We are also satisfied that this error was not harmless under the circumstances of this case and was clearly capable of producing an unjust result. Therefore, we reverse and remand for a new trial.

I.

The parties are fully familiar with the evidence presented at trial. Therefore, we need only recite the most salient facts related to the issues raised on appeal.

A.

At approximately 10:30 a.m. on February 15, 2014, a New Brunswick police officer responding to citizen reports found the body of twenty-two-year-

old William McCaw lying in the snow-covered backyard of a residence on Hartwell Street. The next day, the medical examiner performed an autopsy and found that McCaw had a skull fracture, lacerations on the back of his head and on his face, and signs of brain hemorrhaging. The medical examiner opined that McCaw's death was caused by multiple blunt force injuries to the head delivered by blows from a two-pronged instrument like a crowbar or a wrench.[5] The medical examiner could not provide an exact time of death, but testified that McCaw must have laid bleeding in the snow for some time before he died.

The police canvassed the area, but no one in the neighboring houses reported seeing or hearing anything unusual. The lead investigator, Detective Michael Daniewicz, set up a mobile command center in a police trailer parked on Hartwell Street.

The police learned from interviews that McCaw attended two fraternity parties on the night of February 14 and was heavily intoxicated when he left the second party around 2:30 a.m.[6] McCaw had many friends in the area, and would frequently show up on one of their doorsteps and ask to spend the night. One of

---

[5] The State never recovered the murder weapon.

[6] A toxicological analysis performed during the autopsy revealed that McCaw's blood alcohol content (BAC) measured 0.24%.

A-4314-16

McCaw's friends lived in a house on Robinson Street, which could be accessed from the rear by cutting through the backyard of the home on Hartwell Street where McCaw's body was found.

The police collected approximately 400 hours of surveillance video from area businesses. The videos showed McCaw leaving the fraternity house, attempting to get into a car in the parking lot and, when he was unable to do so because the car was full with other occupants, walking on Easton Avenue toward Hamilton Street. The State believed that McCaw was next seen on one of the videos turning on Hartwell Street, but the defense took the position that the figure on this portion of the video could not be positively identified. The police were unable to obtain any surveillance video clearly showing McCaw on Hartwell Street or in the backyard where he was killed.

The police circulated fliers with McCaw's picture throughout New Brunswick. The fliers did not contain any information about a murder weapon and stated that McCaw was killed "between the hours of 3:00 a.m. and 9:00 a.m. in the area of [the backyard where he was found on] Hartwell Street."

B.

Defendant and his mother owned a row house on Plum Street, which was less than a quarter of a mile away from the murder scene. Defendant lived in

the house with his tenants, including Stoecker and Hasani Gordon. Robert Sparaco and Danica Harpster also stayed there frequently.

Daniewicz testified that "[b]ased upon information received,"[7] he directed Detectives Brandt Gregus and Greg Morris to look for defendant on February 18, 2014, and bring him to the mobile command center. The detectives went to defendant's house, but he was not home. They ordered the occupants to come outside and told them they would have to remain in the cold until defendant was produced. One of the occupants, Ashley Edwards, called defendant twice but he did not answer. Stoecker arrived at the house and was able to contact defendant and advise him of the situation. Morris then got on the phone and told defendant that he would not let his friends go back inside the house unless defendant returned to speak to the detectives.

Defendant testified at the Rule 104 hearing, but not at the trial. He stated he did not want to speak to Morris because the detective had previously worked on another case involving defendant. Defendant lied to Morris by telling him he was in Edison and would talk to him when he got back home. However,

---

[7] At the suppression hearing concerning the statement defendant gave to Daniewicz, the detective testified that defendant became a "person of interest" based on information Daniewicz received secondhand that defendant's nephew suspected defendant of involvement in the homicide due to his recent "irregular" behavior. The jury was not informed of this information at the trial.

A-4314-16

Morris insisted, "you've got to come here now." Defendant complied with this demand.

Defendant testified that as soon as he got home, Morris grabbed his arm "hard" causing him to almost fall, and "escorted" him to a police car, "basically dragging him." Morris did not testify at the hearing, although he was available. Gregus testified that he did not see defendant stumble and claimed that the detectives simply "asked" defendant to accompany them to the command center and he "agree[d]." The detectives did not tell defendant he had the right to refuse to speak to them.

At the command center, the detectives did not read defendant his Miranda[8] rights. In an unrecorded interview that lasted between five and fifteen minutes, defendant stated he was home by 10:00 p.m. on the night of the murder and had not gone out again until 1:00 p.m. the next day. He also stated he had been acting "strange" recently because he had a pending criminal charge and his mother was ill. The detectives then allowed defendant to leave the command center and he walked home. Daniewicz testified that over the next several weeks, the police pursued other leads but, by the middle of March, the investigation was "a cold case" with no viable suspect.

---

[8] Miranda v. Arizona, 384 U.S. 436 (1966).

## C.

During this period, defendant was becoming increasingly concerned that someone had improperly used his bank account to cash the rent checks he received from his tenants. He reported the alleged theft to the Edison police department sometime during the day on February 14, 2014. Detective Michael Horvath, who was handling that investigation, testified that he reviewed a bank surveillance video and identified Stoecker and Edwards as the people in it.

On March 10, defendant texted Stoecker and told him that he and his mother were upset about "the bank fraud." Defendant also texted others and accused Edwards of taking over $3000 from his account in two separate incidents. Two days later, Stoecker, Edwards, and Harpster were arrested in Union County on unrelated burglary and theft charges.

Daniewicz testified that "based upon information received," he spoke to Edwards on March 18, 2014, and took a recorded statement from her. Daniewicz did not reveal the content of the information he received from Edwards to the jury. However, after speaking to Edwards, Daniewicz testified he went to the Union County jail to see Stoecker and took a recorded statement from him. He also seized Stoecker's cell phone and a grey hooded sweatshirt (hoodie) that Stoecker had with him when he was arrested.

On March 19, Daniewicz took Stoecker to the Middlesex County Prosecutor's Office and used police equipment to surreptitiously record three telephone calls Stoecker made to defendant on that date.[9] The State played these calls to the jury at trial. Between the second and third calls, Daniewicz directed Stoecker to send a text message to defendant, the content of which was read at trial. Before the calls were played, Daniewicz explained he worked with Stoecker on the "dialogue" and on "a theme . . . that would be believable," and would "elicit a conversation" from defendant.

The judge gave the jury the following instruction concerning the calls:

> [T]his is a serious and very important instruction to you; right? In a minute the State's going to play that audio recording of this conversation between Mr. Puskas and . . . Stoecker. But let me make sure that you understand what is evidential and what is not. You're instructed that these statements or questions of . . . Stoecker are not to be considered for their truth by you. I instruct you that you can only consider Stoecker's words to provide context of the conversation with Mr. Puskas, to the extent that there's context. The weight and meaning to be given to Puskas's words is for you and only you to decide.

The judge repeated that instruction in his final charge to the jury.

---

[9] In exchange for Stoecker's cooperation, Daniewicz agreed to transfer Stoecker to a different jail and to release Harpster's car, which had been seized in connection with the burglary charges.

## 1.    The first call

The first call between defendant and Stoecker was brief.  After hearing Stoecker say he had just been released from jail, defendant immediately told him to stay away from the house, because his mother was "livid" about the alleged bank theft, in which Edwards had implicated Stoecker to her.  Defendant then got off the phone, saying he would call back soon.

## 2.    The second call and the text message

The second recorded conversation between defendant and Stoecker, the longest of the three, took place hours later on the same evening.  Stoecker told defendant he had been losing sleep lately and was upset because he had been charged with several criminal complaints because of Edwards.  Defendant responded, "[a] lot happened the last couple of days," and changed the topic to the bank video, which, he said, showed Edwards and her boyfriend stealing from his account.  Defendant said he did not know whether Stoecker was involved but hoped he was not.

Stoecker then said he had told Edwards something he did not want her to repeat to anyone.  Defendant assured Stoecker there was "nothing to worry about" before asking him if he had tools that defendant had left in an orange bucket in the garage that was missing.

14

The conversation turned back to Edwards' claim that Stoecker was involved in the theft from defendant's account and to the other charges he was facing because she had informed on him. Stoecker said he could "handle" burglary charges, but was concerned Edwards might say "something" to "them other dudes," to which defendant responded that he planned to stay away from Edwards and from the house for a couple of days and recommended Stoecker do the same.

Stoecker asked defendant "what do you want me to do if some shit comes at me down the pipe" because of what he had "told" Edwards. Defendant said Stoecker should say he was not involved with the bank account incident. Stoecker interrupted, saying "I'm not talking about the bank, bro. I'm talking about when I washed your clothes, bro."

Defendant said Edwards did not "know anything," and if she tried to incriminate Stoecker, he should remind her she was the one in the bank video. Stoecker again redirected, saying, "[y]ou don't understand what I'm telling you. I told her, like, that you went out that night, you know what I'm saying? And then I told her . . . that I washed your clothes."

Defendant again said he was not worried and that Stoecker should just say Edwards was "crazy" if police asked anything. Defendant attempted to end the

15

conversation, but Stoecker asked, "for real though, for me, like, what happened . . . that night, dude?  Like, you didn't [expletive] hit that dude or nothing, did you?"  Defendant said "no" several times, then added "I didn't even have anything with me."  Stoecker asked defendant twice why he had made Stoecker "wash the clothes."  Defendant said that "the clothes" had gotten dirty on the night Stoecker referenced because he had been out kicking car mirrors and fell down in the street.  He said people had come out of their houses and he was worried that he might have been seen.

After defendant again tried to end the conversation, Stoecker said he just wanted "to make sure that . . . we're good on this," to which defendant agreed they were "together," and said again that Edwards was "crazy."  The following exchange then took place:

> DEFENDANT:  Yeah.  Dude, you know, you told --
> you told them I didn't go out of the house.  I didn't go
> out, you know.
>
> STOECKER:  Right.  Right. But like, where -- like,
> you did though, like, where did you go, you know
> what I mean?  For me now, dude --
>
> DEFENDANT:  Well --
>
> STOECKER:  I'm clean now, dude.  My [expletive]
> head, like I haven't slept, dude, you know.

16

DEFENDANT:  Yeah, I hear you. I know. I know. And -- give me two days, you know.

Defendant then told Stoecker he had washed laundry ready for him at the house that he, defendant, had washed.  Stoecker then interjected:

STOECKER:  If it's going to be an issue, like, dude, I just have to know, bro, what did you do in the garage though?

DEFENDANT:  What do you mean what did I do? What did who do in garage?

STOECKER:  Right before you left that night.

DEFENDANT:  I didn't do nothing in the garage, what are you talking about?

STOECKER:  You -- went into the garage before you left.

DEFENDANT:  No, I didn't.

STOECKER:  I don't -- I don't -- I thought you did.  I don't know, this is like --

DEFENDANT:  No.

STOECKER:  -- this is like torturing me, dude, you know.

DEFENDANT:  No, no, no.  Not at all, dude.  No, I didn't.  I went out the front door.

STOECKER:  All right.  Like, I just don't want it to be a problem for us, you know.

17

A-4314-16

DEFENDANT:   No, dude.  It's nothing, dude.  It's nothing.

STOECKER:  I just -- I just want to be, like, on the same page if something, do you know what I mean, like--

DEFENDANT:   A horrible coincidence, that's all it was.

STOECKER:  Burglary and . . . a couple of dollars is a whole lot different than --

DEFENDANT:  Dude, I know.  Dude, that's -- dude, that's just a horrible coincidence is all that was. I had nothing to do with that, bro.

Stoecker said he told Edwards that defendant went out "for, like, an hour or more," to which defendant responded that Stoecker should not worry about what he said to her because she was already "going around saying a lot . . . about you" so it did not matter.  The thirteen-minute call ended soon after that, at 11:06 p.m.

About fourteen minutes later, at Daniewicz's direction, Stoecker sent defendant the following text message:   "Bro, I just got to know, was there anything on the hoodie?  Should I burn it?"  Defendant did not respond to the text.

3.    The third call

Defendant called Stoecker about ten minutes later.  Daniewicz was not

18

able to record the very beginning of that conversation, but, as the five-minute audio recording began, defendant said: "It was the same night, but dude, that had nothing to do with me, dude, stop it, you're freaking me out." Defendant said he went out hours earlier in the night, but he was "well asleep by the time that happened with that kid" and had nothing to do with it. Stoecker asked what time it was that defendant went out. Defendant responded that he went out around midnight and that the homicide was at "like, 3:00 or 4:00" in the morning.

Stoecker responded that defendant had "scared" him by making him wash the hoodie. Defendant and Stoecker then disagreed about who did the laundry, with defendant saying he did it himself and Stoecker claiming defendant had "left it at the back door" for Stoecker to handle. Defendant insisted he went out "hours before" the homicide and that he had run home scared after the incident with the car mirrors. He also told Stoecker that if asked whether he had seen defendant go out later in the night he should tell police that he did not, because that was what defendant had told police. He told Stoecker he was "not worried about something that [he] didn't do."

Defendant asked Stoecker, "[h]ow many times do you say you want to do something and you don't do it . . . [e]verybody says shit . . . how many times you

19

[expletive] bring the crowbar out," adding that such a thing could have gotten Stoecker "charged with 20 attempted murders." Stoecker then asked defendant if he had taken anything from the house that night, which defendant denied. Shortly after that, defendant told Stoecker he needed to go to bed, and the conversation ended.

D.

On March 20, 2014, the police searched defendant's Plum Street home. They seized defendant's sneakers and tools from his garage, but found no physical evidence linking him to the crime scene or McCaw. During the search, the police found drugs and paraphernalia in the attic, where Gordon stayed. The police then arrested Gordon.

The following day, Daniewicz gave the hoodie he took from Stoecker to the State's proposed expert witness, Brandon Epstein, who was reviewing the surveillance videos from the areas around Hartwell Street. Daniewicz asked the expert to look for anyone wearing an item that matched the hoodie. The police arrested defendant later that day.

On April 1, 2014, the police canvassed the area again and found no one who reported that their car mirrors had been broken on the night of the murder.

Stoecker later pled guilty to six of the twenty-four charges that were

pending against him and he was sentenced to a five-year term of Drug Court probation. He died of a drug overdose before the trial. The judge instructed the jury in defendant's case that Stoecker was "unavailable to . . . call as a witness" and that his absence should not factor into their deliberations.

At the trial, Gordon testified that on the night of the murder, he heard Stoecker and defendant having a loud discussion. He went downstairs and saw Stoecker give defendant a brand new "whitish-grey sweatshirt" that defendant put on. Gordon testified, "it wasn't a hoodie," and did not have pockets. Later that night, Gordon heard the back door to the house close and then he heard it close again about thirty to forty-five minutes later. He believed it was defendant who had left and come back, but he only heard the door and did not see him.

Sparaco, who was Stoecker's cousin, testified he had no specific memory of seeing defendant leave the house that night, but said that defendant had a habit of going out for walks. He did not remember what defendant wore that evening.

Harpster told the jury she recalled seeing defendant leave the house after midnight. She was not positive about the time, but believed he left between 1:30 a.m. and 2:30 a.m. Harpster testified defendant was wearing dark winter clothes, "like a hat, coat, all that stuff."

21

The State showed the jury a forty-five minute, composite presentation of the surveillance videos obtained from area businesses. In addition to the videos allegedly depicting McCaw walking toward Hartwell Street, the State's expert found an individual in the videos who was wearing a hooded grey sweatshirt. The State alleged this individual was defendant, an assertion strongly disputed by the defense. None of the videos clearly depicted this individual on Hartwell Street, and did not show McCaw interacting in any way with anyone.

The judge permitted the State to introduce these videos at the trial even though he found that their quality was "not good" and "stinks." However, the judge ruled that Epstein, the State's expert, was not permitted to offer his opinion as to the identity of either of the two individuals shown in the security footage. A defense expert in forensic video analysis testified it was not possible to identify McCaw in the video that purportedly showed him turn toward Hartwell Street because the figure was too indistinct.

The State also presented a DNA expert, Dr. Frank Basile, who excluded defendant and Stoecker as sources of any DNA recovered from swabs taken from McCaw's hands and nails. Basile found human blood on the grey hoodie taken from Stoecker, but could not connect it to either defendant or McCaw. However, the DNA profile on the hoodie matched Stoecker. Basile testified that washing

22

an article of clothing would not necessarily eliminate the DNA, but that "numerous washes" could do so. Basile performed tests on all of the tools taken from defendant's home and they were all negative for blood and DNA.

E.

In its summation, the State used a PowerPoint presentation that included photos, surveillance videos, and transcribed audio from the recorded conversations between defendant and Stoecker. At the exact midpoint of the presentation, after discussing the early phases of the investigation, the State showed the jury a slide that stated:

**The case breaks**

- Sgt. Daniewicz gets information and speaks to Ashley Edwards

- Interviews Wayne Stoecker at the Union County Jail
  - Recovers a sweatshirt and Wayne's phone

- On 3-19-14 Wayne participates in recorded conversations with the defendant

The next thirty slides concerned, referenced, and reproduced dialogue from the recorded calls between defendant and Stoecker. The prosecutor replayed several clips from those calls and suggested "it may be helpful to listen to these clips over and over again," because defendant and Stoecker talked over

23

each other at times.

The prosecutor argued that defendant failed to deny "the fact that he went out for an hour" the night McCaw died or other assertions by Stoecker, including that defendant had asked Stoecker to wash his clothes. After noting that Stoecker had "confronted" defendant about that, the prosecutor remarked that defendant "hesitate[d]" for a "lengthy pause," and explained that defendant did so because he needed to "come up with an explanation" rather than "tell the truth." The prosecutor added that defendant would not deny Stoecker's clothes were washed, only who had washed them, and then connected that admission to Basile's testimony about the potential effects multiple washes could have on DNA.

The prosecutor showed the jury a separate slide of the text message Stoecker sent defendant after the second call. This slide stated:

**After the 2nd call**

- Stoecker sends a text message

    o "Bro I just gotta know was there anything
      on that hoodie? Should I burn it?"

The prosecutor told the jury that the text message was "actually a very telling moment in . . . the progression of this case."

At least four times during summation, the State played audio of

24

defendant's statement, "I didn't even have anything with me," in response to Stoecker's question, "you didn't [expletive] hit that dude or nothing, did you?" The prosecutor then referred to one of the videos that appeared to show the hooded male figure conceal an object in the pocket of his sweatshirt, and said "clearly you can see that he did." She contended the sweatshirt in the video was "consistent with the one that's in evidence" and that the person in the sweatshirt was defendant.

## II.

As noted, the trial judge allowed the State to introduce the statements Stoecker made to defendant during their three telephone calls, and Stoecker's text message to which defendant did not respond. On appeal, defendant's primary argument is that because these statements contained incriminating assertions made by Stoecker, a witness who did not testify, the admission of this evidence violated his "right . . . to be confronted with the witnesses against him" under the Confrontation Clauses of the federal and State constitutions.

Specifically, defendant claims the judge erred by finding Stoecker's assertions non-testimonial, claiming he directly implicated defendant in the homicide and had a "reasonable expectation that his words would be used in a subsequent prosecution." Stoecker told defendant he had incriminated

25

defendant to Edwards and implied defendant had worn his hoodie the night McCaw died and had Stoecker wash it.  Defendant further argues Stoecker's text message asking if there was "anything on the hoodie" and if he should "burn it" communicated testimonial assertions that the State exploited in its summation to suggest defendant's guilt.

Defendant also argues that Stoecker's statements and the related testimony provided by Daniewicz violated the evidence rules prohibiting hearsay pursuant to the Supreme Court's decisions in <u>Bankston</u> and <u>Branch</u>.  Defendant further asserts that this evidence should have been excluded under N.J.R.E. 403 because it was unduly prejudicial and lacked probative value.  We address each of these contentions in turn.

A.

"[W]hen the State moves to introduce an inculpatory, out-of-court statement of a non-testifying witness, the court must be satisfied that the statement does not violate the defendant's right of confrontation under the Sixth Amendment."  <u>State v. Byrd</u>, 393 N.J. Super. 218, 230 (App. Div. 2007). Underlying a criminal defendant's "right to confront his accusers" is "the belief that subjecting testimony to cross-examination enhances the truth-discerning process and the reliability of the information."  <u>State v. Weaver</u>, 219 N.J. 131,

151 (2014).  Cross-examination has frequently "been described as the 'greatest legal engine ever invented for the discovery of truth.'"  Branch, 182 N.J. at 348 (quoting California v. Green, 399 U.S. 149, 158 (1970)).  "Cross-examination necessarily includes the right to impeach or discredit a witness."  State v. Hockett, 443 N.J. Super. 605, 619 (App. Div. 2016) (citation omitted).

In Crawford, the Supreme Court held that the Confrontation Clause bars from a criminal trial all "testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."  541 U.S. at 53-54.  "The threshold issue is . . . whether the proffered statement is 'testimonial . . . .'"  State v. Wilson, 227 N.J. 534, 545 (2017).  The Court left "for another day any effort to spell out a comprehensive definition of 'testimonial,'" to trigger Confrontation Clause scrutiny, but held "it applie[d] at a minimum . . . to police interrogations."  Crawford, 541 U.S. at 68.

The Court noted "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not," and that the Confrontation Clause "reflects an especially acute concern with a specific type of out-of-court statement."  Id. at 51.  The Court then listed non-exhaustive examples of testimonial statements,

which included, among other things, "pretrial statements that declarants would reasonably expect to be used prosecutorially," and statements "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Id. at 51-52. Accord Wilson, 227 N.J. at 545. The Court added that "[s]tatements taken by police officers in the course of interrogations are also testimonial." Crawford, 541 U.S. at 52.

In Davis v. Washington, 547 U.S. 813, 822 (2006), the Court explained that a declarant's statements to police were nontestimonial where "the primary purpose of the interrogation [wa]s to enable police assistance to meet an ongoing emergency," whereas statements would be testimonial if "the circumstances objectively indicate[d] . . . no such ongoing emergency," and "the primary purpose of the interrogation [wa]s to establish or prove past events potentially relevant to later criminal prosecution." Ibid.

New Jersey courts follow the Davis "primary purpose" test with respect to police interrogations. See, e.g., State ex rel. J.A., 195 N.J. 324, 347-48 (2008) (applying "primary purpose" test to exclude, as testimonial, an out-of-court statement to a police officer). Whether a statement is testimonial under the primary purpose test is "a fact-specific analysis . . . based on the circumstances

presented . . . ."  State v. Bass, 224 N.J. 285, 317 n.9 (2016).

Here, defendant sought to exclude as "testimonial" Stoecker's words from the March 19, 2014, recorded conversations and from his text message.  Prior to trial, the judge ruled that Crawford was not implicated because Stoecker's words were not testimonial.  At a pretrial hearing on November 14, 2016, the judge relied primarily on United States v. Hendricks, 395 F.3d 173, 175 (3d Cir. 2005), a case in which the Third Circuit upheld the admissibility of secretly recorded conversations between the State's deceased confidential informant and multiple criminal defendants.  The judge stated:

> [A]fter reading these cases, I made a decision that it's non-testimonial. It's non[-]testimonial.  The conversation was non-testimonial.
>
> And it was -- and one of the last few words of Hendricks . . . everybody thought that it was for the purposes of using it against the codefendants.  Right? For . . . law enforcement purposes.  So that would make it testimonial in nature.  But at the end of the day the whole thing was a conversation between individuals . . . – it wasn't testimonial, . . . .  It made their conversation non-testimonial.  And so looking at that Hendricks decision, and there was a caution at the end of the Hendricks decision that after rereading it and rereading it again made me conclude that . . . the conversation was non-testimonial in nature. That's my ruling on it.

The State had argued that Stoecker's words were admitted only for context and that defendant's responses were admissible as adoptive admissions and as statements against penal interest. The court accepted that argument and, prior to the State playing the calls, the judge instructed the jury that Stoecker's words were only admitted for "context," not for their truth.

Although "[t]rial court evidentiary determinations are subject to limited appellate scrutiny," and are ordinarily "reviewed under the abuse of discretion standard," State v. Buda, 195 N.J. 278, 294 (2008), the question of whether a defendant's constitutional rights to confrontation have been satisfied is a "question of law . . . review[ed] de novo." Wilson, 227 N.J. at 544.

None of the reported post-Crawford decisions in New Jersey directly address whether admitting the out-of-court recorded statements of an informant declarant who does not testify at trial violates the Confrontation Clause. However, J.A., 195 N.J. at 348, and State v. Basil, 202 N.J. 570, 599 (2010) are instructive. In both cases, our Supreme Court held that police officer testimony violated the Confrontation Clause by repeating a non-testifying declarant's out-of-court narrative description of past events that implicated defendant in criminal activity. J.A., 195 N.J. at 348; Basil, 202 at 599.

In J.A., the Court addressed "whether statements made by a non-testifying

witness to a police officer, describing a robbery committed ten minutes earlier and his pursuit of the robbers" were testimonial. 195 N.J. at 329. The Court noted "there was no 'ongoing emergency' . . . and that 'the primary purpose'" of the interrogation of the non-testifying declarant was "to establish or prove past events potentially relevant to [a] later criminal prosecution." Id. at 350 (second alteration in original) (quoting Davis, 547 U.S. at 822). The Court held that "a declarant's narrative to a law enforcement officer about a crime, which once completed has ended any 'imminent danger' to the declarant or some other identifiable person, is testimonial." Id. at 348 (emphasis added) (quoting Davis, 547 U.S. at 827).

The same rule yielded a similar result in Basil, where a non-testifying declarant's statements to police alleging that the defendant had threatened her with a shotgun were made "to assist in an investigation into past criminal conduct," to "relat[e] 'what happened,' and therefore [to] recount[] past events— 'an obvious substitute for live testimony.'" 202 N.J. at 598-99 (quoting Davis, 547 U.S. at 830). Because the police officers' "primary purpose" in interrogating the declarant "was to investigate a possible crime, . . . the non-testifying witness's statement about how she was threatened with a gun was testimonial and inadmissible." Id. at 599 (quoting Davis, 547 U.S. at 830).

In this case, the State used Daniewicz to present Stoecker's recorded, out-of-court assertions describing what he purportedly knew about defendant's involvement in McCaw's death and his questioning of defendant regarding his suspicions. Although Stoecker spoke to defendant directly, he was, like the declarants in Basil and J.A., speaking to police too, because he knew Daniewicz, who coached him on what he should say, was listening. Moreover, Stoecker also knew Daniewicz could measure his comments on the call against what he had told the detective in his recorded statement the previous night. The content of that statement was kept from the jury to avoid hearsay. But if Daniewicz would be prohibited from repeating to the jury what Stoecker had described to him out of court about defendant's involvement in the homicide, there is no clear reason why playing a recording of those same allegations would cleanse them of their testimonial character.

Stoecker acted in concert with the lead investigator in forming his questions, which were specifically designed to elicit incriminating responses. Among other things, he asked where defendant went the night McCaw died, if he "hit that kid," what he should say to homicide detectives if Edwards told them what he told her, and whether defendant wanted him to burn his hoodie.

Moreover, Stoecker, who was facing two dozen criminal charges, had

32

already benefited from a transfer to a different jail and from getting Harpster's car returned, and he likely anticipated that continued cooperation would help him resolve those charges. Indeed, Stoecker later received a non-custodial sentence of Drug Court probation as a way to settle all outstanding matters, including the six to which he had pled guilty.

"[A]n objective witness" observing the rehearsed recordings would "reasonably . . . believe" they were likely to be "use[d] at a later trial." Crawford, 541 U.S. at 51-52. See also Bass, 224 N.J. at 316-17 (holding an autopsy report by non-testifying medical examiner was testimonial, where autopsy was conducted in presence of police during active homicide investigation). Therefore, we are satisfied that Stoecker's words from the recorded calls and his text message were out-of-court, testimonial statements from a non-testifying declarant that incriminated defendant in McCaw's death. Admitting this evidence at trial violated the Confrontation Clause, as expressed in Crawford, 541 U.S. at 68, and its progeny.

Nothing in Hendricks, on which the trial judge relied heavily, changes our conclusion. In Hendricks, the prosecution had sought to use recorded face-to-face conversations between a confidential informant (CI), who died prior to trial, and various defendants. 395 F.3d at 182. The Third Circuit held that "the party

33

admission and coconspirator portions of the disputed . . . conversations [were] nontestimonial . . . ." Id. at 183-84. The admissibility of that evidence, in turn, permitted introduction of the deceased CI's statements as well, to "put the statements of the other parties to the conversations 'into perspective and make them intelligible . . . and recognizable as admissions.'" Id. at 184 (quoting United States v. McDowell, 918 F.2d 1004, 1007 (1st Cir. 1990)). "[T]he Confrontation Clause [did] not bar . . . the informant's portions" that were "reasonably required to place the defendant or coconspirator's nontestimonial statements into context." Ibid.

However, Hendricks was decided in 2005, prior to the Supreme Court's decision in Davis, and before both our state and the Third Circuit formally adopted the "primary purpose" test. See Lambert v. Warden Greene SCI, 861 F.3d 459, 470 (3d Cir. 2017) (holding that because co-defendant's statements to a psychiatrist that inculpated defendant were "made with the primary purpose of substituting for his in-court testimony about the crime," they were testimonial); State v. Michaels, 219 N.J. 1, 31 (2014) (noting New Jersey's continued adherence to the "primary purpose test" in Confrontation Clause challenges).

Seven years after Hendricks, the Third Circuit clarified its Crawford analytical framework in United States v. Berrios, 676 F.3d 118, 124 (3d Cir.

2012), which also involved the secret recording of criminal defendants, but differed from this case in that neither declarant was aware they were being recorded. Though the Berrios court determined the "conversation was not testimonial, and thus not subject to Confrontation Clause scrutiny[,]" it added that, hypothetically, there could "be some instances . . . where the primary purpose of the declarant's interlocutor was to elicit a testimonial statement, such that even if the declarant's purpose was innocent, the conversation as a whole would be testimonial" and therefore inadmissible. Id. at 127, 128 n.5 (emphasis added).

The present case fits squarely into that hypothetical situation. The primary purpose of Stoecker, defendant's interlocutor, was to elicit incriminating admissions from defendant on behalf of law enforcement for later use at trial, which he did, and which the State then used to convict defendant without defendant ever having had the opportunity to impeach or discredit his accuser. Therefore, defendant's right to confrontation was violated. Crawford, 541 U.S. at 52.

B.

"In addition to determining whether the introduction of an out-of-court testimonial statement by a non-testifying witness violates a defendant's right to

confrontation, the court must also be satisfied that introduction of the statement is authorized pursuant to an exception to the hearsay rule or by other law." Byrd, 393 N.J. Super. at 232. Hearsay is defined as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." N.J.R.E. 801. Hearsay is inadmissible at trial, pursuant to N.J.R.E. 802, unless it falls under one of twenty-seven exceptions codified in N.J.R.E. 803. Among those exceptions are statements by a party opponent, pursuant to which an opposing party's own statements may be offered against that party, including against a criminal defendant. N.J.R.E. 803(b).

"One of the central principles of the law of evidence is that all hearsay is inadmissible unless it falls within one of the many exceptions to the hearsay rule." Branch, 182 N.J. at 357. "The rule generally shields a party from damning out-of-court statements, which are offered for their truth but are not subject to the truth-testing rigors of cross-examination." Id. at 342. It "applies when a declaration is offered to prove the truth of the statement attributed to the declarant," and "if evidence is not offered for the truth of the matter asserted, the evidence is not hearsay and no exception to the hearsay rule is necessary to introduce that evidence at trial." State v. Long, 173 N.J. 138, 152 (2002).

"Whether . . . statements are hearsay depend[s] on the State's intended use of them and who will present that testimony at the trial." Ibid.

1.    Whether Stoecker's words were hearsay

In admitting the calls, the trial judge held that Stoecker's words were being offered "contextually," and not "for the truth of the matter asserted," such that the judge did not "have to worry about the hearsay rules."

"Evidentiary rulings made by the trial court are reviewed under an abuse-of-discretion standard." State v. Scharf, 225 N.J. 547, 572 (2016). "To that end, trial courts are granted broad discretion in making decisions regarding evidentiary matters, such as . . . whether a particular hearsay statement is admissible under an appropriate exception." Ibid. Appellate courts "will reverse an evidentiary ruling only if it 'was so wide off the mark that a manifest denial of justice resulted.'" State v. Mauti, 448 N.J. Super. 275, 307 (App. Div. 2017) (quoting Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016)). However, "[i]f the trial court fails to apply the proper legal standard in determining the admissibility of proffered evidence," evidentiary rulings are reviewed de novo. State v. Williams, 240 N.J. 225, 234 (2019).

Here, although the judge instructed the jury that the intended use of Stoecker's words were for context and not for their truth, the State clearly used

several of Stoecker's express and implied assertions in the calls and the text message for their truth, particularly in its summation. The prosecutor repeatedly referenced defendant's inability to come up with explanations when "confronted" with certain facts by Stoecker in the calls and questioned the veracity of the explanations given by him. It would be incongruous to conclude Stoecker's words were admitted only for context when the State emphasized to the jury that defendant's failure to refute the things Stoecker said was significant.

For example, in summation, the prosecutor argued that defendant failed to deny "the fact that he went out for an hour" the night McCaw died, or that the hoodie he borrowed from Stoecker had been washed, and connected the latter admission to Basile's testimony about the effects multiple washes could have on DNA. The jury could have accepted that argument as an explanation for why defendant's DNA was not on the hoodie that McCaw's killer purportedly wore.

Stoecker was not just the only person who alleged defendant had asked him to wash his hoodie after borrowing it the night McCaw died, he was the only person who said or implied that defendant wore it at all. It was only through Stoecker's comments and his text message that the State was able to explain why the hooded figure in the video presentation was defendant, even though the hoodie was Stoecker's, not defendant's, and only had the former's DNA. Even

if only some of Stoecker's words were used for their truth, and others were there for context, statements used for their truth must fall within a hearsay exception to be admissible. Branch, 182 N.J. at 357.

"Context" is not among the exceptions listed in N.J.R.E. 803, which was designed as a "comprehensive and cohesive scheme for the permissible introduction of hearsay in our courts" through the Rules of Evidence. State v. Rose, 206 N.J. 141, 174 (2011). "When adopting our codified Rules of Evidence, New Jersey specifically declined to adopt a residual hearsay exception, as was adopted in the rules governing practice in the federal courts." Ibid. Therefore, the judge mistakenly admitted the entirety of Stoecker's out-of-court declarations in the calls and in the text message for the purpose of providing "context," when, in actuality, the State relied on some of those declarations for their truth.

   2.    Whether Daniewicz's testimony contained hearsay

In Bankston, a police officer testified that "based on information received[,]" police went to a tavern and saw defendant, who fit "the description of the person that [the police] were looking for." 63 N.J. at 266-67. The Court found that although an officer may testify to actions taken based on "information received . . . to show that the officer was not acting in an arbitrary manner or to

A-4314-16

explain his subsequent conduct . . . when the officer becomes more specific by repeating what some other person told him concerning a crime by the accused the testimony violates the hearsay rule." Id. at 268.

"When the logical implication to be drawn from the testimony leads the jury to believe that a non-testifying witness has given the police evidence of the accused's guilt, the testimony should be disallowed as hearsay." Id. at 271. Although in Bankston "the police officers never specifically repeated what the informer had told them, the inescapable inference from [one officer's] testimony was that . . . an unidentified informer, who was not present in court and not subjected to cross-examination, had told the officers that defendant was committing a crime." Ibid. The Court excluded the testimony as "clearly hearsay." Ibid.

In Branch, a police detective testified in a burglary prosecution "that he included defendant's picture in a photographic array because he had developed defendant as a suspect 'based on information received[,]'" and further "testified to the out-of-court descriptions of the burglar given by two non-testifying child victims." 182 N.J. at 342. The Court held "the hearsay rule [is] violated when, at trial, a police officer conveys, directly or by inference, information from a non-testifying declarant to incriminate the defendant in the crime charged." Id.

40

at 350.

The rule that has emerged from <u>Bankston</u>, <u>Branch</u>, and the cases that followed is that "a police officer may not imply to the jury that he possesses superior knowledge, outside the record, that incriminates the defendant." <u>Id.</u> at 351. Though "witnesses may testify that they took certain investigative steps based 'upon information received[,]' . . . they cannot repeat specific details about a crime relayed to them by a . . . person without running afoul of the hearsay rule." <u>State v. Luna</u>, 193 N.J. 202, 217 (2007).

Here, although defendant frequently raised the <u>Bankston</u> and <u>Branch</u> objections to Daniewicz's testimony before and during trial, the judge did not analyze the testimony under that framework. Instead, the judge noted that, unlike in <u>Branch</u>, the "information received" by Daniewicz came from a "known person" rather than an "unknown person," but did not clarify how this affected the admissibility of the testimony.

Regarding the hoodie, the judge similarly did not address any of its hearsay implications, stating simply that an instruction regarding Stoecker's unavailability would cure any problems. When, as here, "the trial court fails to apply the proper test in analyzing the admissibility of proffered evidence, our review is de novo." <u>State v. Rinker</u>, 446 N.J. Super. 347, 358 (App. Div. 2016).

One month into the investigation, the McCaw homicide was a "cold case" with "no viable suspect." Daniewicz then spoke to and took recorded statements from Edwards and Stoecker, after which he seized the latter's sweatshirt and cell phone. From Daniewicz's testimony, the jury could have readily inferred that both Edwards and Stoecker must have given incriminating information about defendant to the detective.

Other than those out-of-court statements, no evidence was presented regarding what led Daniewicz to seize Stoecker's items, look for defendant's number in his phone, and then collaborate with him on a plan to inculpate defendant on a recorded line the next day. Within two days of those recorded conversations, police searched defendant's residence and arrested him, and Daniewicz also told Epstein to look for defendant and for Stoecker's hoodie in the videos.

In effect, the jury was told that, in three days, the homicide investigation went from a "cold case" to one in which police were exploring no suspects other than defendant, based predominately, if not entirely, on information Daniewicz had received from Edwards and Stoecker, neither of whom testified at trial, and on the mix of denials and admissions Stoecker extracted from defendant in the recorded calls. The clear inference was that Daniewicz zeroed in on defendant

42

because he possessed "superior knowledge, outside the record," from non-testifying witnesses "that incriminate[d] the defendant," the exact issue that was addressed in Branch, 182 N.J. at 351. Because Daniewicz "convey[ed] . . . by inference, information from a non-testifying declarant" that incriminated defendant, that testimony was hearsay and should have been excluded. Id. at 350.

a.    State v. Medina, 242 N.J. 397 (2020)

Our conclusion that this evidence was barred by Bankston and Branch is supported by the Supreme Court's recent decision in State v. Medina, 242 N.J. 397 (2020).[10] There, as here, the identity of the perpetrator of an assault was a contested issue in a trial where there was no physical evidence linking the defendant to the crime. Id. at 401. A witness who was unwilling to give a formal statement to police or to testify, "identified defendant as the attacker" and showed police a picture of defendant that the witness had obtained from a social networking website. Ibid.

Based on the identification, and how it matched the physical descriptions of the suspect that the victim and another witness had already given police, a

_____

[10] The State apprised us of the Court's decision in Medina after it submitted its merits brief pursuant to Rule 2:6-11(d).

photo array that included the defendant's picture was prepared, and from that array, the victim of the assault was able to identify the defendant as the perpetrator. Id. at 402-03. Although the State kept the non-testifying witness's identification out of the trial, the officer did say in his testimony that he had spoken to a woman at the scene of the assault who did not want to get involved and he further testified that he had compiled the photo array from which the victim identified the defendant "based on information received." Id. at 404.

The Appellate Division panel in Medina, relying largely on Bankston and Branch, held that it was reversible error to permit the officer to "tell[] the jury that police spoke with the anonymous woman and thereafter generated a photo array . . . ." Id. at 409. On certification, the Supreme Court reversed. Id. at 401.

In its decision, the Court discussed two interrelated issues relevant here: (1) whether the officer's testimony about the anonymous non-testifying witness or (2) the use of the phrase, "based on information received," as an explanation for the placement of defendant in the photo array served to create the "inescapable inference" that the officer "possesse[d] superior knowledge, outside the record, that incriminate[d] the defendant." Id. at 419 (quoting Branch, 182 N.J. at 351).

As to the first issue concerning the testimony about the anonymous witness, the Court noted that "[e]ven when an officer does not specifically repeat" information gleaned from a non-testifying witness, such testimony may, by implication, create the inference that Bankston and its progeny sought to eradicate. Id. at 415-16. Applying that standard, the Court held that because the police officer neither repeated the specific information the anonymous witness told police nor "otherwise created an 'inescapable inference' that she incriminated defendant[,]" the testimony did not "conflict with [these] principles." Id. at 416. The only references to the witness in the officer's testimony were that she did not want to get involved or give a statement, which led the Court to accept the State's argument "that the jury likely considered the anonymous woman to be a 'dead-end witness.'" Id. at 416.

The Court observed that the State was careful not to repeat what she told police, and "went to great lengths to suggest that she was not forthcoming." Ibid. The Court contrasted this to "the prosecutors in Bankston . . . who emphasized the importance of the non-testifying witness's incriminating information . . . ." Ibid. The Court also noted that "the references to the anonymous woman would have seemed less significant" to the jury than other record evidence, including the testimony of witnesses who identified defendant as the culprit. Id. at 416-

17.

As to the second issue, the use of the phrase "based on information received," the Court noted that in the context of photo identifications, the law had recently "retreated from . . . the use of neutral phrases—such as that an officer developed a photo array <u>or identified a suspect</u> 'based on information received'—to explain an officer's conduct." <u>Id.</u> at 418 (emphasis added). The phrase was both irrelevant and highly prejudicial to the extent that it implied the testifying officer "had information from an out-of-court source, known only to him, implicating [the] defendant . . . ." <u>Id.</u> at 419 (first alteration in original) (quoting <u>Branch</u>, 182 N.J. at 352-53).

"Based on information received," "based on the evidence collected," and similar phrases should only be used, the Court noted, when necessary "to rebut a suggestion that [the officer] acted arbitrarily and only if the use of that phrase does not create an inference that the defendant has been implicated in a crime by some unknown person." <u>Id.</u> at 419 (alteration in original) (quoting <u>Branch</u>, 182 N.J. at 352). The "best practice," the Court added, was to avoid such expressions when explaining why a defendant's picture was in a photo array, because "such language [could] potentially sweep in inadmissible hearsay by producing the 'inescapable inference' that the officer obtained incriminating

information about the defendant beyond the scope of the record." Id. at 420-21 (quoting Bankston, 63 N.J. at 271).

Applied to the facts of Medina, the Court held that the context in which the "information received" phrase was used was unlikely to "compel[]" the jury "to infer . . . that the officer 'possesse[d] superior knowledge, outside the record, that incriminate[d] the defendant.'" Id. at 419 (quoting Branch, 182 N.J. at 351). Rather, it was "reasonable that the jury believed the record evidence led [the officer] to place defendant's picture in the array." Id. at 420.

"[M]ost importantly" for the Court, the officer had "repeatedly told the jury that no one other than [the two testifying witnesses] came forward to give a statement[,]" which implied the "information received" referred to the testifying witnesses' statements, not to information gleaned from any anonymous witness. Ibid. It would have been different, the Court cautioned, if the officer "testified that officers spoke with the anonymous woman and," on that basis, "placed defendant's picture in the array—without reference to any other forms of evidence—then the 'logical implication' from [the officer's] testimony would have been that the anonymous woman implicated defendant to police." Id. at 421.

i.    Testimony about non-testifying declarants in this case

47

Here, as in <u>Medina</u>, the officer did not "repeat[ ] the specific information" that Stoecker and Edwards, the non-testifying witnesses, told him in their out-of-court statements. In <u>Medina</u>, however, the out-of-court declarant was never identified, and the State gave the general impression she was a "dead-end witness." <u>Id.</u> at 416.

The circumstances of this case are different. As discussed earlier, the State specifically identified both Edwards and Stoecker as important out-of-court declarants in the following slide in its PowerPoint presentation:

**The case breaks**

- Sgt. Daniewicz gets information and <u>speaks to Ashley Edwards</u>

- <u>Interviews Wayne Stoecker</u> at the Union County Jail
  - Recovers a sweatshirt and Wayne's phone

- On 3-19-14 Wayne participates in recorded conversations with the defendant

[(Emphasis added).]

The jury was already aware at that point from trial testimony that Stoecker was defendant's friend and roommate, and that he collaborated with Daniewicz in the attempt to elicit incriminating admissions from defendant in the recorded calls. Although the actual content of Stocker's taped statement to police was

48

kept from the jury, Daniewicz seized the hoodie immediately after speaking to Stoecker and then set up the recorded calls between defendant and Stoecker the following day. In addition, Daniewicz only contacted Stoecker after he spoke to Edwards, who obviously provided information to the detective leading him to Stoecker.[11]

The inescapable inference from these facts was that, in his initial statement to the lead investigator, Stoecker supplied "superior knowledge, outside the record, that incriminate[d] the defendant," Branch, 182 N.J. at 351, by tying him to the hoodie the State argued was used by the victim's killer. Stoecker then repeated these allegations on a recorded telephone line, using a script he wrote in collaboration with Daniewicz.

It was therefore inevitable that the jury would have assumed that Stoecker, in his taped statement, must have incriminated defendant to police in some way. Without that inference, the testimony about seizing the hoodie and arranging the recorded calls would not have made sense, nor would a key component of the State's theory—that defendant borrowed the hoodie.

The State also offered Stoecker's claim that defendant made him wash the

---

[11] At a Rule 104 hearing, Edwards stated she told the police that Stoecker had information about a New Brunswick homicide. As noted, this information was not provided to the jury.

hoodie, a notion also introduced into the case by Stoecker with Daniewicz's assistance, as not only substantive evidence of defendant's consciousness of guilt, but also as an explanation for why no DNA evidence linked defendant or the victim to the suspected blood stain on the hoodie. Defendant had no opportunity to test the reliability of any of these incriminating out-of-court declarations through cross-examination. See Weaver, 219 N.J. at 151 (holding that the foundation of the Sixth Amendment is "the belief that subjecting testimony to cross-examination enhances the truth-discerning process and the reliability of the information.").

The fact that Stoecker and Edwards, who led police to Stoecker, did not testify renders Daniewicz's and the prosecutor's references to their out-of-court incriminating statements a violation of the hearsay rules and of defendant's right of confrontation. Branch, 182 N.J. at 350.

    ii.    "Based on information received" testimony in this case

As to the second issue addressed in Medina, Daniewicz twice affirmed in his testimony that it was "based on information received" that he took certain investigative actions that led the homicide investigation in the direction of defendant. Prior to that testimony, the defense had unsuccessfully objected under Branch to Daniewicz testifying to actions taken "based on information

A-4314-16

received."

The first use of the phrase came when the State engaged with Daniewicz in the following colloquy concerning what led to his interview with defendant on February 18, three days after the victim's body was found:

> Q. Based upon information received did you make arrangements to speak to a Timothy Puskas?
>
> A. I did.
>
> [(Emphasis added).]

The State further elicited from Daniewicz that the interview with defendant took place at the mobile command center, in the presence of a second detective, after he had "ask[ed] officers to go out and see if they could find" defendant. In his Miranda testimony, but not his trial testimony, Daniewicz said that defendant was a "person of interest," not a suspect, at that time.

Under Medina, 242 N.J. at 420, and Branch, 182 N.J. at 352, testimony that "information" from an unknown source led Daniewicz to direct other officers to seek out defendant and bring him in for questioning was not the "best practice" as there had been no suggestion by defendant that Daniewicz had acted arbitrarily in bringing defendant in for questioning. Not only was there no suggestion of arbitrariness, but the reference to "information received" was completely unnecessary. Daniewicz had already testified that the investigation

51

had shifted away from people who knew the victim towards the broader community. He stated that a "big net" was cast "for anything that would be of any kind of informative or investigative value." Police circulated fliers, conducted door-to-door canvassing, and set up a mobile command unit in the sixth ward where defendant lived.

Had Daniewicz not testified that "information received" led him to defendant, the jury would almost certainly have assumed that defendant's initial encounter with the police was the ordinary result of their door-to-door "big net" investigation, especially since there was testimony that defendant lived close to where the victim was found. Instead, the fair implication of the "information received" testimony was that an anonymous non-testifying witness gave police incriminating information about defendant.

Unlike Medina, where the Court inferred that the jury likely believed that other admissible trial evidence was the "information received" that implicated the defendant in that case in the assault that the testifying officer referred to, here, no other evidence introduced at trial suggested the police suspected defendant's involvement at that point in the investigation. The jury could not have surmised, for example, that the "information received" was that the police had identified defendant on the surveillance videos. It was not until around the

A-4314-16

time of defendant's arrest, more than a month after his first police interview, that Daniewicz gave Epstein defendant's address and directed him to look for a figure in a sweatshirt on the videos. The prosecutor stated specifically in her summation that it was only after the recorded calls that Epstein was able to identify the hoodie in the videos, and only then were the videos purportedly depicting defendant "discovered."

With no other evidence for the jury to consider as the potential "information received" that could have led Daniewicz to want to speak to defendant in the first place, the reference, though brief, "create[d] an inference that the defendant ha[d] been implicated in a crime by some unknown person," Medina, 242 N.J. at 419. In addition, Daniewicz did not merely testify that he passively received a statement from defendant about his whereabouts. Instead, he specifically testified that at his direction, the police actively sought defendant out and escorted him to the command unit for an interview.

Moreover, this was not the only reference in Daniewicz's testimony to "information" he "received" out of court that led him to defendant. Later in his testimony, Daniewicz gave the following responses to the prosecutor concerning the status of the investigation about one month after the detective's initial encounter with defendant:

Q. [G]oing into the middle of March, 14th, 15th, in that time frame, what was the status of the investigation?

A. What I would call a cold case. I mean, there's no viable suspect.

Q. Did that mean that you stopped working on the case?

A. No.

Q. Based upon information received, on March 18th, 2014[,] did you speak to Ashley Edwards?

A. I did.

Q. Where did you speak to her?

A. At the Edison Police Department.

Q. Did you take a recorded statement from her?

A. I did.

Q. What did you do -- what did you do next? Who did you speak to next?

A. Sergeant Paul Miller. And then I made arrangements to speak to someone named Wayne Stoecker.

Immediately after this testimony, Daniewicz said that he went to the Union County Jail, where Stoecker was being held, and then took the recorded statement from him that was played at trial.

54

Taken together, the jury was twice told by the lead detective in the homicide investigation that non-testifying witnesses gave police information outside of court that, in each case, led Daniewicz directly, and only, to defendant. In one instance, out-of-court information led police to seek defendant out and have him brought in for questioning about his activities the night of the homicide. In the other instance, the information led police to seize a sweatshirt they later argued was worn by the victim's killer and set up a recorded conversation designed to incriminate the defendant.

Therefore, Medina does not support the State's contentions on this point and the judge erred by admitting this hearsay evidence at the trial.

C.

Evidence should be excluded under N.J.R.E. 403 where its "probative value [i]s substantially outweighed by the risk of undue prejudice." State v. Alston, 312 N.J. Super. 102, 114 (App. Div. 1998). Applying this standard, we conclude that even if the calls, the text message, and the testimony concerning them were conditionally admissible to place defendant's admissions in context, their "probative value" was "substantially outweighed by the risk of . . . [u]ndue prejudice, confusion of issues, or misleading the jury." N.J.R.E. 403.

Given that defendant had already told police he went out the night McCaw

died, as had Harpster and Gordon, the probative value of defendant's statements to this effect during the calls was minimal. The jury could have inferred that he attempted to deceive police in his earlier statement when he told them he was home two hours earlier than that, but, even so, that inconsistency would not have much probative weight. Similarly, defendant's statement that he believed the victim had been killed at three or four in the morning should be afforded minimal weight considering that the police fliers distributed throughout New Brunswick contained the same information.

Daniewicz's references to Stoecker's and Edwards's out-of-court declarations also had great potential for prejudice in a case built on circumstantial evidence. To the extent the evidence cumulatively conveyed to the jury that out-of-court statements by declarants inculpated defendant in the homicide, there is "very little that could be more prejudicial or more harmful" than that. Alston, 312 N.J. Super. at 114. Therefore, the judge erred by allowing the State to present this evidence to the jury.

D.

In so ruling, we reject the State's argument that Stoecker's statements during the telephone calls and in the text message were admissible as adopted admissions by defendant. Pursuant to N.J.R.E. 803(b)(2), a statement offered

against a criminal defendant is admissible, subject to the restrictions of N.J.R.E. 104(c), when the statement's "content . . . has [been] adopted by [the party's] word or conduct or in whose truth the party has manifested belief . . . ." However, courts should exercise "extreme caution . . . when dealing with a hearsay statement as an adoptive admission . . . ." State v. Briggs, 279 N.J. Super. 555, 562 (App. Div. 1995).

"Critical to such admission is the requirement that the defendant disclose, or be made aware of, the content of that which he is allegedly admitting to." Id. at 562-63. "Moreover, it must be clear that the defendant 'understood and unambiguously assented' to the statement." Id. at 563 (quoting United States v. Beckham, 968 F.2d 47, 52 (D.C. Cir. 1992)). Accord State v. Stubbs, 433 N.J. Super. 273, 285 (App. Div. 2013). In a criminal case in which the State seeks to admit an adoptive admission of the defendant, the State, as the proponent of the admission, bears "the burden of persuasion that the out-of-court statement satisfied the elements of an exception to the general rule of inadmissibility." Stubbs, 433 N.J. Super. at 285-86.

In Briggs, a jailhouse informant testified that he had asked the defendant whether it was true that a different witness had "told . . . everything" to the police, including that the defendant "did it," and the defendant responded by

A-4314-16

insisting the witness was "going to change her statement" after talking to the defendant's lawyer, and was "going to say that they scared her, she didn't know what she was doing, they threatened to take her kids away from her." 279 N.J. Super. at 562. This court held that the State failed to meet its burden of establishing the witness's hearsay statements were admissible as adoptive admissions, because the defendant's response was "hardly an expression of admission or belief in [the] truth" of what the hearsay declarant said. Id. at 563.

Here, the prosecutor argued in her summation that defendant adopted Stoecker's assertion that he went out for an hour the night of the homicide, and that he also adopted Stoecker's remark that defendant asked him to wash his clothes by "hesitat[ing]" for a "lengthy pause" in order to "come up with an explanation" rather than "tell the truth." Notwithstanding what may have been going through defendant's mind during the gaps at issue, the takeaway from these arguments is that the recordings do not reflect defendant's unambiguous assent to either assertion by Stoecker, the hearsay declarant. Ibid. In fact, defendant unambiguously denied the latter assertion. As in Briggs, the State did not meet its burden of showing that defendant unambiguously adopted Stoecker's words as admissions. Id. at 563. Therefore, this evidence should not have been admitted.

E.

The State contends that even if the judge erred by admitting this evidence, the prejudicial impact of allowing the jury to consider Stoecker's statements in the recorded telephone calls and the text message was harmless. We disagree.

As our Supreme Court stated in State v. J.R., 227 N.J. 393 (2017):

> An error will not lead to reversal unless it is "clearly capable of producing an unjust result." R. 2:10-2. Thus, even though an alleged error was brought to the trial judge's attention, it will not be grounds for reversal if it was "harmless error." State v. Macon, 57 N.J. 325, 337-38 (1971).
>
> An evidentiary error will not be found "harmless" if there is a reasonable doubt as to whether the error contributed to the verdict. State v. McLaughlin, 205 N.J. 185, 211-12 (2011) (citing Macon, 57 N.J. at 338). The prospect that the error gave rise to an unjust result "must be real [and] sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached." State v. Lazo, 209 N.J. 9, 26 (2012) (second alteration in original) (quoting [State v.] R.B., . . . 183 N.J. [308,] 330 [(2005)]). As the Court noted in [State v.] W.B., . . . "[c]onvictions after a fair trial, based on strong evidence proving guilt beyond a reasonable doubt, should not be reversed because of a technical or evidentiary error that cannot have truly prejudiced the defendant or affected the end result." 205 N.J. [588,] 614 [(2011)].
>
> [227 N.J. at 417 (first, second, and ninth alterations in original).]

59

Here, the State argues that the jury had already heard Gordon, Harpster, and Sparaco testify that defendant had left his home in the early morning hours of February 15, 2014, and had heard from Gordon that the sweatshirt belonged to Stoecker. Thus, the State claims that the evidence "attributable to Stoecker and Edwards" was "cumulative to testimony the jury heard from witnesses that defendant left the house and that defendant was wearing the hooded sweatshirt on February 15[]."

Contrary to the State's contentions, however, certain incriminating facts, essential to the State's theory of the case, came directly from Stoecker's mouth and not from any testifying witness. No trial witness identified defendant as the hooded figure in the video, placed him in the hoodie, or emphasized that he had insisted on having it washed. Although Gordon said he saw defendant wearing a sweatshirt the night McCaw died, he testified it was "not a hoodie," and had no pockets in it, which was inconsistent with the sweatshirt in the video.

Gordon also did not see defendant leave the house that night, but only heard the door open and close and just assumed defendant had left and come back. Sparaco, who was also there, had no specific recollection of defendant going out that night and had never seen defendant wearing Stoecker's clothes. Harpster said she remembered defendant going out that night, but described him

as wearing dark clothes, including a hat and a coat.

Thus, the admissible evidence the State presented against defendant was hardly overwhelming. No physical evidence connected defendant to the crime. The surveillance videos did not show defendant and McCaw interacting in any way. Nothing in the record indicates that defendant knew McCaw or encountered him on the night of the murder.

Given the circumstantial nature of the evidence of defendant's guilt, the admission of hearsay testimony "may well have been [a] decisive factor" and cannot be considered harmless error. Bankston, 63 N.J. at 273. This is especially the case here where the prosecutor highlighted the improperly-admitted testimony in her summation to the jury.

Therefore, we conclude that the cumulative impact of the calls, the text message, and the testimony about how Edwards's and Stoecker's out-of-court declarations changed the course of the investigation raised a reasonable doubt as to whether the error in admitting this evidence contributed to the verdict. J.R., 227 N.J. at 417. Because the error in admitting in this evidence was clearly harmful under the circumstances of this case, we are required to reverse defendant's convictions.

F.

In reaching this conclusion, we also considered, but rejected, the State's contention that the trial judge's curative instruction was sufficient to forestall the harm caused by the improper admission of the evidence described above. For the following reasons, we conclude that the judge's instruction was inadequate to cure the error created when the jury was allowed to consider Daniewicz's testimony, the surreptitiously recorded telephone calls, and Stoecker's text message.

As a general matter, "[t]hat the jury will follow the instructions given is presumed." State v. Loftin, 146 N.J. 295, 390 (1996). "The presumption is founded in part on necessity," and is "[o]ne of the foundations of our jury system." State v. Herbert, 457 N.J. Super. 490, 503-04 (App. Div. 2019) (alteration in original) (quoting State v. Burns, 192 N.J. 312, 335 (2007)).

However, the presumption of compliance with instructions does not extend to "contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." Bruton v. United States, 391 U.S. 123, 135 (1968). For example, in Bruton, the Court held it could not ignore the "substantial threat to petitioner's right to

confront the witnesses against him" that was posed by the introduction, during a joint trial, of a codefendant's confession implicating the defendant in the crime "[d]espite the concededly clear instructions to the jury to disregard [the codefendant's] inadmissible hearsay evidence inculpating petitioner." Id. at 137. See also Bankston, 63 N.J. at 272 (holding that trial court's curative instructions were inadequate to redress harm to the defendant where instructions failed to "reference . . . the hearsay testimony which had been previously given" by a testifying officer about looking for the defendant at specified location "based on information received"); State v. Dehart, 430 N.J. Super. 108, 115 (App. Div. 2013) (holding officer's testimony repeating double hearsay that incriminated a criminal defendant was harmful error where the "defendant's identification, or misidentification, was the main issue at trial").

Recently, when determining whether curative instructions adequately cured the prejudicial taint of inadmissible evidence in the context of an application for a mistrial, this court considered three non-exclusive factors: "the nature of the inadmissible evidence the jury heard, and its prejudicial effect," the "instruction's timing and substance," and ultimately the court's "tolerance for the risk of imperfect compliance." Herbert, 457 N.J. Super. at 505, 507.

With respect to timing, "a swift and firm instruction is better than a delayed one."  Id. at 505-06.  As to substance, "a specific and explanatory instruction is often more effective than a general, conclusory one," because an instruction is "more effective when it explains itself."  Id. at 506.  For example, a hearsay instruction explaining "why a hearsay statement is inherently unreliable and should be disregarded," could be "successful in persuading a jury to disregard it."  Id. at 507 n.4.  Also relevant is whether evidence "bears directly on the ultimate issue before the jury," because if it does it "may be less suitable to curative or limiting instructions than evidence that is indirect and that requires additional logical linkages."  Id. at 505.  With respect to imperfect compliance, "[a]n instruction can be curative only if the judicial medicine suits the ailment," and not if it "fails to clearly and sharply address the prejudicial aspect of the inadmissible evidence."  Id. at 508.

Herbert, a murder case, involved two improper references to gangs in a detective's trial testimony:  first, that the defendant was a gang member, and second, that the crime occurred in a "gang area."  Id. at 510-11.  The Appellate Division held that the trial court's prompt curative instruction was inadequate, in part because the testimony "filled a hole in the State's case" by suggesting a motive for the defendant to commit the homicide that was otherwise absent, and

64

by "tarr[ing] [the] defendant as a gang member." Id. at 509. The trial court instructed the jury that "there was 'no information in this case' about gang involvement," and later that the jury should not "consider the gang situation." Id. at 500.

We held that this instruction "did not fully and clearly address," much less cure, the "substantial prejudice." Id. at 512. The instruction failed to "contradict the truth of the detective's statement," and, at best, told the jury "there was no evidence that a gang had ordered the homicide or the homicide arose out of a gang rivalry," but said nothing about the defendant's own gang membership, and "suffered from vagueness." Id. at 510, 512. "As a result of these deficiencies," we held that "the risk of the jury's non-compliance with the court's instructions was intolerably high," particularly since "[t]he State's case was far from overwhelming," and "depended on the often-inconsistent testimony of two eyewitnesses." Id. at 512.

In State v. Greene, 242 N.J. 530 (2020),[12] the alleged error was that the State's opening statement gave a detailed preview of the expected trial testimony of the defendant's grandmother, who did not testify in the murder trial as

_____

[12] Defendant apprised us of the Court's decision in Greene after he submitted his merits brief pursuant to Rule 2:6-11(d).

planned.  Id. at 535.  Among other things, the prosecutor said that the grandmother was in a "difficult position," because she had given a "taped statement" to a detective detailing her grandson's confession.  Id. at 542-43.

Later, after the grandmother refused a court order to testify, the court denied the State's attempt to admit her prior statement because the defendant had not had an opportunity to cross-examine her.  Id. at 543.  To attempt to remediate the prejudice from the State's opening reference to the non-testifying grandmother's taped statement, the trial court instructed the jury that the prosecutor's opening statement concerning the expected testimony of the defendant's grandmother was "not evidence and cannot be considered by you in your deliberations."  Id. at 544.

The defendant was convicted, we overturned the conviction, and the Supreme Court affirmed, reasoning that the grandmother's taped statement "contained the most profoundly damaging evidence," and the prosecutor's reference to it created "an ineradicable impression in the mind of a juror that no curative instruction likely could erase."  Id. at 553.  Even though the defense had not sought a mistrial, the Court held it was plain error not to grant one, because "not even the most exemplary curative instruction could have neutralized the lingering prejudicial effect of the confession . . . ."  Id. at 554.

A significant factor for the Greene court was that the evidence against the defendant[13] "was far from overwhelming" such that the prosecutor's comments could not be considered "harmless beyond a reasonable doubt." Ibid. (quoting State v. McCloskey, 90 N.J. 18, 32 (1982)).

As discussed above, the "nature of the inadmissible evidence" at issue in this case involves three broadly overlapping errors, the prejudicial effect of which is cumulative: (1) Daniewicz's testimony about receiving "information" concerning defendant from three non-testifying sources, one never identified, that led police to want to question defendant about the homicide in two separate instances; (2) Daniewicz's testimony that he seized the hoodie used later to identify defendant as the hooded figure in the surveillance video after taking Stoecker's taped statement; and (3) Stoecker's taped testimonial hearsay statements contained within the recorded calls and the text message. The jury watched the surveillance videos of the hooded figure and listened to the tapes of the recorded calls multiple times during its deliberations, increasing the likelihood for prejudice if it was improper to admit hearsay evidence linking

---

[13] By contrast, the Court upheld the conviction against a codefendant, in part because there was strong corroborating evidence implicating the codefendant in the homicide, including DNA. Id. at 556-57.

defendant to the hoodie or to an out-of-court taped statement to police in which information about defendant's guilt was disclosed to police.

1.    Timing and substance of the curative instruction

First, as to the Daniewicz testimony "based on information received," there was no curative or limiting instruction given.  The judge ruled that specific testimony admissible over defendant's objection during a sidebar conference. Nor were any curative or limiting instructions given concerning the references to Stoecker's and Edwards's taped statements or to the hoodie.

With respect to the Stoecker statements from the recorded calls and the text message, the judge twice instructed the jury that the "statements or questions of Wayne Stoecker are not to be considered for their truth by you," and directed them to "only consider Stoecker's words to provide context of the conversation with [defendant] to the extent there is context."

The judge also instructed the jury that Stoecker was unavailable to testify, but that if he had testified, "he would have come under the ambit of" the instruction concerning the testimony of cooperating witnesses Randy Thomas and Hasani Gordon that the court had just given.  In that instruction, and with Stoecker's name added for clarity, the judge stated:

> Hasani Gordon[, Wayne Stoecker,] and Randy
> Thomas, witnesses herein, have testified to facts which

A-4314-16

may show some involvement on their part in other criminal matters. The law requires that the testimony of such a witness be given careful scrutiny. In weighing his or her testimony, therefore, you may consider whether he had or they had a special interest in the outcome of the case and whether their testimony was influenced by the hope or expectation of any favorable treatment or reward, or by any feelings of revenge or reprisal.

If you believe this witness to be credible and worthy of belief, you have a right to convict the defendant on their testimony alone, provided, of course, that upon a consideration of the whole case, you are satisfied beyond a reasonable doubt of [defendant's] guilt.

From a timing perspective, instructing the jury on the permissible uses of Stoecker's statements prior to hearing the recordings supported an inference that it was "successful in dissuading the jury from entering onto the path of inference in the first place." <u>Richardson v. Marsh</u>, 481 U.S. 200, 208 (1987). On substance, however, the instruction was more general than specific and failed to "explain[] itself." <u>Herbert</u>, 457 N.J. Super. at 506.

For the instruction to be effective it should have directed the jury that Stoecker's words were hearsay, that hearsay was generally unreliable, and that the jury could not consider Stoecker's words for <u>any</u> purpose other than making defendant's admissions comprehensible. <u>Id.</u> at 507 n.4. The judge also did not caution the jury as to the potentially misleading aspects of the recorded calls.

As a result, a juror hearing the judge's instruction may have thought the "context" in which they must consider Stoecker's words was that Stoecker had already incriminated defendant to Daniewicz and had worked with him on a script. The jury certainly was not directed not to "accept" Stoecker's words as true because of their unreliable hearsay character. Construed literally, the jury may have interpreted the instruction to mean that Stoecker's statements were true, but that the jury should disregard "their truth" and focus on what defendant said. In that respect, the instruction did not "clearly and sharply address the prejudicial aspect of the inadmissible evidence." Herbert, 457 N.J. Super. at 508.

2.    Degree of tolerance for the risk of imperfect compliance

With respect to the imperfect compliance with instructions factor, the Crawford and Bankston issues both implicate the Confrontation Clause. To find a "constitutional error . . . harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." State v. Castagna, 187 N.J. 293, 312 (2006). "An instruction can be curative only if the judicial medicine suits the ailment." Herbert, 457 N.J. Super. at 507. As discussed above, the jury was not given any instruction with respect to the Daniewicz testimony or the hoodie, and was given a prompt, but inadequate, instruction with respect to

Stoecker's statements from the recorded calls.

Multiplying the potential for juror confusion, the prosecutor spoke more than once in summation of the "facts" Stoecker articulated that defendant failed to "deny" and, as discussed, argued that the big "break" in the case came from Stoecker and Edwards, neither of whom testified at the trial. This was a circumstantial evidence case for which the jury deliberated at least five days before reaching a verdict. During that time, they asked for two readbacks of the recorded conversations between defendant and Stoecker, and a third readback just of the first ten minutes of the second call.

Under these circumstances, we are satisfied that notwithstanding the curative instructions, the error of admitting prejudicial testimonial hearsay and other evidence that implied the State possessed outside evidence of defendant's guilt cannot be considered harmless beyond a reasonable doubt. As noted, the State's case against defendant "was far from overwhelming." Greene, 242 N.J. at 554. Here, the risk that the jury did not follow the judge's inadequate instructions was "so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system" cannot be ignored. Bruton, 391 U.S. at 135. Therefore, we reverse defendant's convictions and remand for a new trial.

III.

In light of our determination that a new trial is required for the reasons we have discussed, we need not reach defendant's remaining arguments. The trial court will have to consider defendant's contentions concerning the admissibility of his February 18, 2014 statements to the police and the surveillance videotapes in the context of a new trial, which may or may involve new or additional proofs and legal arguments. Defendant's complaints about the prosecutor's summation, the denial of his motion for a new trial, the instructions provided to the jury, and the sentence he received are also now moot in view of our holding.

Nevertheless, we briefly address the procedure used by the trial judge to review the State's motion to admit defendant's February 18, 2014 statements so that the mistakes made in the handling of that motion are not repeated at the new trial.

Here, the trial judge conducted an evidentiary hearing on the State's motion approximately three weeks before the trial began. At the conclusion of the hearing on October 25, 2016, the judge reserved decision, but did not decide the motion until the first day of trial on November 15, 2016, after the jury had already been selected.

72

This was contrary to <u>Rule</u> 3:9-1(e), which clearly requires the court to conduct pretrial hearings "<u>to resolve</u> issues relating to the admissibility of statements by defendant, . . . sound recordings, and motions to suppress shall be held <u>prior</u> to the [p]retrial [c]onference" required by <u>Rule</u> 3:9-1(f). (Emphasis added). The purposes underlying the <u>Rule</u> are clear.

> First, it provides a technique for substantially expediting the conduct of the trial itself. The evidence questions covered by the rule ordinarily involve the taking of testimony outside the presence of the jury, and these voir dire hearings, if conducted during the trial, impair the continuity of trial as well as substantially imposing upon the time of the jurors. More significantly, these determinations, if made prior to jury selection, constitute interlocutory determinations which may be appealable by the State. This procedure also provides a more meaningful opportunity for a defendant to seek leave to appeal from the adverse determination.
>
> [Pressler & Verniero, <u>Current N.J. Court Rules</u>, cmt. 6 on <u>R.</u> 3:9-1 (2021).]

In addition to these considerations,

> adverse determinations of such questions, when they constitute, in effect, the sole defense, may result in a defendant's decision to plead guilty, and, if he or she wishes to appeal the ruling, entering a conditional plea pursuant to and in accordance with [<u>Rule</u>] 3:9-3(f). Finally, both parties are able to more effectively prepare their cases for trial if they know, by pretrial determination, which evidence will be inadmissible.

[<u>Ibid.</u>]

As we have observed:

> Without [these] pre-trial determination[s], a defendant
> is left in the dark about a critical part of the State's
> proofs against him. A defendant is entitled to know, in
> advance of trial, the full arsenal of evidence the State
> has amassed against him, including whether the State
> can legally present to the jury statements he may have
> made to the police. Such knowledge is not only
> indispensable to formulate a sound defense strategy at
> trial, but it is also essential in assisting a defendant in
> making the decision to accept or reject a prosecutor's
> plea-agreement offer. <u>R.</u> 3:9-1(b), (e).
>
> [<u>State v. Elkwisni</u>, 384 N.J. Super. 351, 360 n.3 (App.
> Div. 2006), <u>aff'd</u>, 190 N.J. 169 (2007).]

Moreover,

> [t]he State is also prejudiced if a determination as to the
> admissibility of a defendant's statements is not made
> before trial. Without advance notice of what evidence
> will be admitted at trial, the prosecutor: (1) is unable
> to assess rationally the strengths and weaknesses of the
> State's case; and (2) risks creating grounds for a
> mistrial, by unknowingly advising the jury, in the
> course of his/her opening statement, of information the
> court may subsequently determine to be inadmissible.
>
> [<u>Ibid.</u>]

In addition to neglecting to make a timely ruling on the motion, the judge
did not make any findings of fact, determinations of witness credibility, or
conclusions of law in support of this decision. Instead, the judge merely stated:

74

"I rule that [defendant's] first encounter with law enforcement that resulted [in] him going in to this . . . command center in the community was not custodial and did not violate his rights."[14]

Because the judge's findings were insufficient to enable us to review defendant's contention that the statements should be suppressed, we temporarily remanded the matter and directed the judge to reconsider his decision and make detailed findings of fact and conclusions of law. The judge subsequently provided this court with a short written decision again denying defendant's request to suppress the February 18, 2014 statements.

In rendering his decision, the judge stated he found that defendant's claim that the police grabbed him by the arm and escorted him to a waiting police vehicle to be taken to the command center was "incredible" because there "was simply no testimony or evidence to corroborate defendant[']s story . . . ." However, the judge made no credibility findings concerning the testimony provided at the hearing by Detective Gregus, which was also not corroborated by anyone else. He also did not address Edwards' testimony that appeared to corroborate defendant's assertion that Detective Morris previously ordered

---

[14] Although the judge later stated during the trial on November 18, 2016 that he was drafting a decision on the Miranda issue, he never provided an oral or written decision on this issue to the parties until our remand order.

defendant to return to the house so he could be questioned.  Moreover, the judge made no credibility findings concerning Edwards' account of what transpired before defendant arrived at the house.

As a result, we would not have been able to review defendant's contentions concerning the admissibility of the February 18, 2014 statements even had we not determined that a reversal of his convictions was required for other reasons. Under these unique circumstances, we specifically vacate the trial court's decision to permit the introduction of the statements at trial, without prejudice to the State's right to seek their admission at the new trial.  Any such motion should be filed by the State and resolved by the court prior to the pretrial conference, which would avoid the problems caused in this case by the failure to follow the legal roadmap provided by the Rules of Court.

Additionally, we strongly caution trial judges that the unintended, negative consequences that may flow from a lack of adherence to the pretrial procedures and calendaring requirements of Rule 3:9-1 certainly outweigh any minor inconveniences a brief delay in the start of a trial to ensure full compliance may engender.  We also reiterate that trial courts are required to make proper findings of fact and relate those findings to their conclusions of law.  Curtis v. Finneran, 83 N.J. 563, 570 (1980).  As our Supreme Court made clear over forty

years ago, the "[f]ailure to perform that duty 'constitutes a disservice to the litigants, the attorneys and the appellate court.'" Id. at 569-70 (quoting Kenwood Assocs. v. Bd. of Adj. of Englewood, 141 N.J. Super. 1, 4 (App. Div. 1976)).

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4314-16